UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                            **ORDER & OPINION**

            - against-                                      07 CR 971 (RPP)

CHRISTOPHER MICHAEL COKE,

                                Defendant.
------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.,**

    **I. Introduction**

        The Defendant, Christopher Coke ("Coke" or "Defendant"), is charged in a two-count superseding indictment ("Indict.") with conspiring to distribute marijuana and cocaine, in violation of 21 U.S.C. § 846, and conspiring to traffic in firearms, in violation of 18 U.S.C. § 371. Trial is currently scheduled to begin on September 12, 2011.

        On June 14, 2011, one day before *in limine* motions were due, the Court received a "Court-Ordered Memorandum of Law" ("Def. 6/14/11 Mem.") from the Defendant.[1] In this memorandum, the Defendant argued that he was entitled to the suppression of wiretap evidence on the basis of his Fifth Amendment rights because the United States "Government knowingly and intentionally obtained [wiretap] evidence in violation of a treaty between the United States and Jamaica and in violation of Jamaican law." (Id. at 4.) On June 15, 2011 this Court issued an order scheduling a June 17, 2011 conference so that a trial schedule could be set.

        On the evening of June 15, 2011, at 11:36:48 p.m., defense counsel filed a "Motion to Exclude All Wiretap Evidence from Use at Trial." ("Def. Mot. to Exclude."). The motion relied on affidavits of experts as to Jamaican law, the affidavit of the Attorney General of Jamaica, the Report of the Commission of Enquiry into the Extradition Request of the Government of the

---
[1] Despite the memorandum's caption, the Court had not requested such a filing.

United States for Christopher Coke, and the 2007 wiretap application to the Jamaican court, to further argue that "the Government of the United States knowingly and surreptitiously stole the Coke wiretap interceptions from Jamaica." (Id. at 5.) None of these documents were initially supplied to the Court. By Order dated June 16, 2011, the Court directed the Defense to supply these documents and directed the Government to supply a copy of the "two secret memorandums of understanding between the executive branch of the Government of the United States and the Government of Jamaica dated April 27, 2004" ("MOUs") on which the Defense motion also relied. (Court Order dated June 16, 2011 at 1.)

On June 17, 2011, Defendant submitted a Memorandum of Law in Response to the Court's June 16, 2011 Order ("Def. 6/17/2011 Mem.") in which he added, as a separate legal basis for exclusion, the supervisory powers of the federal courts. (Id. at 4.). On June 29, 2011, the Government submitted its memorandum in opposition to the Defendant's motion to suppress the wiretap evidence. ("Gov. Mem. in Opp."). On July 7, 2011, the Defense submitted its reply memorandum ("Def. Reply Mem."). In these papers, for the first time, Coke argued that the two 2004 MOUs between Jamaica, the United Kingdom and the United States were illegal under United States law and further claimed, without support, that the DEA was aware of this illegality and intentionally entered into the MOUs. (Id. at 6, 8, 9.) On July 12, 2011 the Government submitted its sur-reply in opposition ("Gov. Sur-Reply Mem."). This Court held oral argument on July 12, 2011.[2]

For the following reasons, the Defendant's motion to suppress the wiretap evidence is denied.

---

[2] "Tr." will refer to the transcript of this oral argument dated July 12, 2011.

**II. Facts & Background**

As set forth in the superseding indictment filed on February 19, 2009, Coke is alleged to have controlled the Tivoli Gardens area in Kingston, Jamaica since in or about the early 1990s. (Indict. at 3.) Tivoli Gardens is a barricaded neighborhood guarded by a group of armed gunmen who allegedly act at Coke's direction. (Id.) Coke is alleged to have armed these gunmen with firearms he imports illegally. (Id.) Coke is also alleged to have controlled a criminal organization known as the "Shower Posse" or "Presidential Click". (Id.) The superseding indictment alleges that members of this organization have been involved in drug trafficking of marijuana and cocaine in the New York area, Kingston, Jamaica, and elsewhere, from at least in or about 1994 up to and including October 2007. (Id.) According to the Government, the evidence against Coke includes, among other things, recordings of intercepted telephone calls collected in Jamaica and the United States, testimony of cooperating witnesses, and seizures of narcotics. (Gov. Mem. in Opp. at 3.)

In April and June of 2004, representatives of law enforcement, intelligence, and military agencies from the United Kingdom, Jamaica and the United States Drug Enforcement Administration ("DEA"), entered into two MOUs in order to facilitate joint law enforcement efforts to combat drug trafficking and organized crime. One of the MOU's concerned the United Kingdom's ("UK") creation and funding of a telecommunications intercept facility in Jamaica (the "intercept facility"), to be controlled and operated by Jamaican authorities. According to this MOU, the Jamaican authorities would share intelligence information from the intercept facility with the UK authorities and the DEA. The second MOU provided for the creation of a "link" between the intercept facility and the Jamaican Narcotics Division ("JND"), so that the JND could use the intercept facility to intercept telecommunications in accordance with the

requirements of Jamaican law. The DEA agreed to contribute funding toward the establishment of the "link" and the information thereby obtained was to be provided to DEA for use as evidence in court proceedings. Both memoranda were signed on behalf of Jamaica by Dr. Peter D. Philips ("Dr. Philips"), the Jamaican Minister of National Security from 2001 until 2007. (Gov. Mem. in Opp., Ex. B at 12, 20.)

Beginning in October 2004, the Jamaican Supreme Court issued a series of orders authorizing the interception of Coke and his co-conspirators' cell phones in Jamaica. Those orders and interceptions continued into at least 2007. According to the Government, the Defendant was intercepted on "numerous occasions discussing criminal activities, including narcotics distribution and firearms trafficking" during this period. (Gov. Mem. in Opp. at 6.) The Jamaican authorities shared those intercepts with the DEA. (Id.) The DEA used some of those interceptions in its application for authorization to intercept a number of telephones in the United States, used by Coke's co-conspirators and other individuals. (Id.) The Government intends to introduce a number of the Jamaican and U.S. intercepts at trial in this case. (Id.)

In August 2009, the United States requested that the Government of Jamaica extradite Coke based on his Indictment in this case. (Gov. Mem. in Opp., Ex. B. at 10.) Initially, the Government of Jamaica refused to allow the extradition proceeding of Coke to be held and claimed that "certain aspects of the extradition request breached Jamaican laws and treaties." (Gov. Mem. in Opp. at 7.) However, on May 17, 2010, Dorothy Lightbourne ("Lightbourne"), Jamaica's Minister of Justice, signed the Authority to Proceed with the extradition request. (Gov. Mem. in Opp., Ex. B. at 44-45.)

Shortly thereafter, the Defendant requested through counsel that the Jamaican Supreme Court remove and quash Lighbourne's decision, restrain Lightbourne from carrying into effect

4

her decision, restrain the Attorney General and the Director of Public Prosecutions from proceeding with the Extradition request, and stay the extradition proceeding in the Resident Magistrates Court. (Gov. Mem. in Opp., Ex. C. at 2.) The Supreme Court, in a 22-page opinion denied the request for judicial review of the Lightbourne decision. (Id., Ex. C at 21.) The Court also declined to rule on the Defendant's claim that there were "serious defects in the evidence submitted by the [United States], namely that it was in contravention of the Constitution of Jamaica, the Interception of Communications Act [("ICA" or "the Act")] and an order of a Judge of the Supreme Court of Jamaica." (Id., Ex. C. at 18-19.) Rather, the Court found that the Defendant could have surrendered to the Court's jurisdiction and then raised his claims and "pursue[d] remedies under the statutory provisions at each stage outlined in the [Extradition Act]." (Id., Ex. C. at 20-21.) The Defendant did not do so and was arrested by Jamaican authorities on June 22, 2010. (Id., Ex. B. at 11.) After presentment before the Jamaican Magistrate Judge the Defendant consented to extradition and waived any challenges to the request for extradition. (Gov. Mem. in Opp. at 8.)

The Commission of Enquiry into the Extradition Request of the Government of the United States for Christopher Coke ("the Commission") was subsequently convened to review the Coke extradition. Multiple Jamaican government officials testified in front of this Commission. The Commission issued findings relating to the extradition based on "what appears to [it] to be the law." (Id., Ex. B. at 25.) The Commission found that by sharing the intercepted communications with the United States authorities, Jamaican officials violated the ICA.[3]

---

[3] According to the defense, the ICA "requires that any non-consented-to electronic interception of a private telephone call be done upon obtaining an order from a judge, based upon a legally sufficient application for a warrant. Additionally, this statute limits both those persons, who can conduct the court-ordered interception, and those persons, to whom the intercepted communications can be disseminated to, i.e. limits the persons who can listen to or read any transcripts of the intercepted communications. It is a crime under Jamaican law for an authorized officer to disclose an intercepted communication to someone whom the judge and the intercept law do not authorize to have the interception disclosed." (Def. Mot. to Exclude at 3,4.) According to the Commission's

5

Furthermore, because the sharing violated that Act, the Commission found it was also in violation of the Jamaican Constitution.[4] The Commission further concluded that even though the MOUs authorized this sharing, the MOUs were not part of Jamaican law and could not modify the law. (Id., Ex. B. at 25, 27, 31.) The Commission found that Dr. Philips' "obvious intention [in executing the MOUs] was to bring narcotics dealers and gun runners to justice." (Id., Ex. B. at 20.) The Commission also noted that Dr. Philips had consulted with the Jamaican Solicitor General prior to signing the MOUs, and that "[t]he U.S. authorities may have thought that the MOUs were part of the laws of Jamaica as they were signed by a Minister of Government." (Id., Ex. B. at 18, 20.)

Coke now seeks suppression of the intercepted wiretaps on the basis that: 1) "the Jamaicans filed and handled [themselves] in an illegal manner…when they presented [the wiretap applications] to the Supreme Court judge and hid the fact that these documents were going to be shared with Americans" (tr. at 4-5) in violation of the ICA and 2) the DEA illegally "usurp[ed] the authority of the State Department" in signing the MOUs and "intentionally violated the law in Jamaica" by entering into MOUs they knew were in violation of Jamaican law (id. at 6.).

**III. Discussion**

Coke asserts that there are two bases upon which this Court can exclude the wiretap interceptions—the Due Process Clause of the Fifth Amendment and this Court's own supervisory powers.

---

findings, the warrant which permitted the interception of Coke's telephonic communications specified that the communications were to be "intercepted and supplied to a restricted group of people [and t]he Judge made no directions as to copies or dissemination thereof." (Gov. Mem. in Opp., Ex. B. at 15.) The communications were nonetheless supplied to the United States as provided in the MOUs. (Id.) As such, the Commission concluded that this dissemination was in violation of the ICA.

[4] The Government assumes, for the purposes of this motion, that the Commission's findings on these points are accurate as a matter of law. (Gov. Mem. in Opp. at 9 n.3.)

*a. The Fourth Amendment*

As an initial matter, Coke concedes that he is not protected by the Fourth Amendment and therefore, recognizes that he cannot seek to suppress the wire interceptions of his telephone calls on that basis. (Def. Court Ord. Mem. of Law at 2, Tr. at 18.) The Supreme Court held in United States v. Verdugo-Urquidez, 494 U.S. 259, 274-75 (1990), that where a defendant is not a United States citizen, and has no substantial, voluntary attachment to the United States, and the search at issue occurs abroad, "the Fourth Amendment has no application." In Verdugo-Urquidez, the Court concluded through a textual reading of the Fourth Amendment that the "purpose of the Fourth Amendment was to protect the people of the United States against arbitrary action by their own Government; [and that] it was never suggested that the provision was intended to restrain the actions of the Federal Government against aliens outside of U.S. territory." Id. at 266. Because there is no evidence that Coke had any "substantial, voluntary attachment" to the United States, both the Defense and Prosecution agree that the Fourth Amendment cannot be a basis for suppression of the seized wiretap evidence. (Def. Court Ord. Mem of Law at 2, Gov. Mem. in Opp. at 10-14, Tr. at 17-18).

*b. The Fifth Amendment*

Recognizing the inapplicability of the Fourth Amendment, Coke goes on to argue that the Due Process Clause of the Fifth Amendment "does apply regarding how the evidence in question was obtained." (Def. Court Ord. Mem. of Law at 3.) Coke argues that because the Fifth Amendment applies to any "person"—as opposed to the Fourth Amendment which applies only to the "people"—"[t]he Due Process Clause, itself and independent of any other constitutional provision, is a source for excluding evidence a federal criminal trial." (Id.)

Coke is partially correct—the Fifth Amendment Due Process clause can protect a foreign national being prosecuted in the United States. See Verdugo-Urquidez, 494 U.S. at 278 (Kennedy, J., concurring). This right, however, is not absolute. Here, Coke's claim is plainly a Fourth Amendment claim relating to an allegedly unlawful search and seizure in Jamaica of monitored telephone conversations. As such, pursuant to the Supreme Court's precedent set forth in Graham v. Connor, 490 U.S. 386, 393-95 (1989), Coke's claim is limited to a Fourth Amendment analysis. In Graham, the Court held that where "the Fourth Amendment provides an explicit textual source of constitutional protection against…intrusive governmental conduct, that Amendment, *not* the more generalized notion of 'substantive due process' must be the guide for analyzing these claims." Id. (emphasis added). Coke argues that his right to be free from unreasonable searches and seizures was violated by a joint venture by the U.S. and Jamaican authorities. That argument is a Fourth Amendment argument. As discussed *supra*, Verdugo-Urquidez forecloses Coke's ability to seek suppression based on the Fourth Amendment. Coke is seeking to use the Fifth Amendment's more generalized substantive due process to end run this foreclosure. As Graham and its progeny have outlined, however, this is an inappropriate use of the Fifth Amendment.[5] Accordingly, the Court declines to suppress the wiretap information on this basis.

However, even if the Due Process Clause of the Fifth Amendment could apply to Coke's motion to suppress, Coke falls far short of establishing that the conduct of U.S. or Jamaican Government officials violated his due process rights. The Supreme Court has long held that in

---

[5] In support of his position that the Due Process Clause provides an alternate basis on which he can seek suppression, Coke relies on the Supreme Court's decision in Rochin v. California, 342 U.S. 165 (1952). In Rochin, the Court analyzed a search using the substantive due process standard and reversed the defendant's conviction on the basis that the admission of the evidence violated the defendant's due process rights. This case, however, predates Graham. In fact, following Graham, the Supreme Court noted in Sacramento v. Lewis, 523 U.S. 833, 849 n.9 (1998) that the defendant in Rochin "would be treated under the Fourth Amendment." See also Brown v. Doe, 2 F.3d 1236, 1243 (2d Cir. 1993) ("Rochin now stands at most for the proposition that a prosecution may effectively be foreclosed by exclusion of evidence tainted by a Fourth Amendment violation.")

order for Government conduct to rise to the level of a violation of due process, it must "shock the conscience." See United States v. Salerno, 481 U.S. 739, 746 (1987) (Fifth Amendment Due Process Clause provides a substantive due process right that "prevents the government from engaging in conduct that 'shocks the conscience'") (internal citation omitted). Further, this Circuit has held that only conduct that is "'so outrageous' that common notions of fairness and decency would be offended" can constitute a substantive due process violation. United States v. Schmidt, 105 F.3d 82, 91 (2d Cir. 1997) (internal citation omitted). Such "outrageous" or "conscience shocking" behavior involves "egregious invasions of individual rights," United States v. Rahman, 189 F.3d 88, 131 (2d Cir. 1999) (citing Rochin v. California, 342 U.S. 165 (1952) (breaking into suspect's bedroom, forcibly attempting to pull capsules from his throat, and pumping his stomach without consent)), or "coercion," Schmidt, 105 F.3d at 91 (citing Watts v. Indiana, 338 U.S. 49, 55 (1949) (six days of intense interrogation by multiple police officers)).[6]

*The alleged violations of Jamaican law do not amount to a due process violation*

Coke claims that Jamaican and United States officials engaged in a joint venture to intentionally violate Jamaican law by sharing recordings of intercepted calls, "deliberately and deceitfully" failed to advise the Jamaican court which reviewed the wiretap applications that such sharing would occur, and submitted legally insufficient wiretap applications to the Jamaican

---

[6] As the Government notes, "outrageous" government misconduct has been found primarily in cases where the Government actively participated in a criminal enterprise in order to gather evidence against a defendant. (Gov. Mem. in Opp. at 20 n.10.) See United States v. Bin Laden, 2001 WL 30061, at *7 (noting that as of that date only three federal appellate courts had granted relief to a criminal defendant on the basis of outrageous government conduct, all relating to the Government's involvement in the criminal enterprise and citing United States v. Lard, 734 F.2d 1290, 1292, 1296-97 (8th Cir.1984) (finding outrageous conduct where ATF agents had assisted defendants in making a pipe bomb); United States v. Twigg, 588 F.2d 373, 382 (3d Cir.1978) (holding that government's conduct was outrageous when DEA agents concocted a drug crime and supplied the defendants with the means to accomplish it); United States v. Greene, 454 F.2d 783, 787 (9th Cir.1971) (finding outrageous conduct in a case in which the government had manufactured a crime for the sole purpose of convicting the defendant)).

Court.[7] Coke further argues that it is "presumed that the DEA knew the limits of Jamaican wiretap law prior to signing [the MOUs]" and therefore that the DEA should be presumed to have knowingly violated Jamaican law.[8] (Def. Reply Mem. at 6 n.6.) Even assuming that all of Coke's factual allegations are true, none of these allegations rise to the level of a due process violation as articulated by the case law. See Rochin v. California, 342 U.S. 165 (1952) (finding that the invasive and brutal conduct of forceful stomach pumping "shocks the conscience" and rises to the level of a due process violation).[9]

---

[7] Coke claims that the United States was engaged in a "joint venture with law enforcement personnel of the Government of Jamaica to conduct a narcotics investigation of defendant Coke." (Def. Mot. to Exclude at 1, 2.) This concept, which has *not* been adopted by the Second Circuit, United States v. Vilar, 2007 WL 1075041, at *54 and *54 n.34 (S.D.N.Y. Apr. 4, 2007) (internal citations omitted), is relevant where a defendant to whom the Fourth Amendment applies, seeks to suppress evidence obtained overseas where "the conduct of foreign law enforcement officials rendered them agents or virtual agents of the United States law enforcement official" and the search did not meet the requirements of foreign law. United States v. Maturo, 982 F.2d 57, 61-62 (2d Cir. 1992). Here, even if the Second Circuit had adopted the joint venture concept, Coke, as a non-citizen, has no standing to bring a Fourth Amendment claim. His motion is brought under the Fifth Amendment. The Commission found that Dr. Philips, the Jamaican Minister of National Security, acted with the "obvious intention…to bring the narcotics dealers and gun runners to justice" (Gov. Mem. in Opp., Ex. B. at 20) and went on to note that Dr. Philips' "intention should now be implemented by amendment to the Act, which [the Commission] understand[s] from Senator Nelson, Minister of National Security, is now being done." (Id.) Since the Defendant is not making a Fourth Amendment claim and the Commission, at most, found a technical violation of Jamaican law which it recommends be rectified, there is no need to determine whether an "agency" relationship existed between the two Governments.

[8] Coke further argues that the Court should infer that the DEA intentionally deceived Jamaican authorities because "the Jamaican Prime Minister, Jamaican Attorney General, and other members of the Jamaican Cabinet were deprived of knowledge of the very existence of [the MOUs]." (Def. Reply Mem. at 5.) As the Government notes, "this argument ignores the critical fact that Dr. Philips, the Minister of National Security, who had supervisory authority over the Jamaican military and Jamaican police, signed [these MOUs] on behalf of the Jamaican Government." (Gov. Sur-Reply Mem. at 7.) Further, Dr. Philips did consult with the Solicitor General of Jamaica before entering the MOUs. (Gov. Mem. in Opp., Ex. B. at 20.) While it was later determined that Dr. Philips did not inform other members of the Jamaican Government about the MOUs, this fact does not provide a basis to believe that the MOUs themselves were unlawful or that the DEA was aware that they were unlawful. Indeed the Commission found that the second MOU required that "any interception of communications through the JND link will be carried out strictly in accordance with the requirement of Jamaican law" and acknowledged that the "U.S. authorities may have thought that the MOUs were part of the law of Jamaica as they were signed by a Minister of Government." (Id., Ex. B. at 17-18.)

[9] Coke, citing Elkins v. United States, 364 U.S. 206, 223-24 (1960), then argues that just as federal agents cannot use evidence obtained by state officers in violation of the Fourth Amendment, United States law enforcement should not be permitted to use evidence obtained in violation of foreign law. As the Government points out, this "contention rests on the false premise that a violation of foreign law is the equivalent of a violation of the United States Constitution. It is not." (Gov. Mem. in Opp. at 13 n.7.) In fact, Courts in this Circuit have expressly declined to consider whether the gathering of evidence overseas by United States law enforcement officials violated foreign law because "[t]he admissibility of evidence in a United States court depends solely on compliance with United States law." United States v. Rommy, 506 F.3d 108, 128-29 (2d Cir. 2007) (declining to determine whether Dutch law was violated in connection with defendant's motion to suppress); see also United States v. Umeh, 762 F.Supp.2d 658, 664-65 (S.D.N.Y. 2011) (declining to consider whether DEA investigation violated Ukrainian law where such

*The alleged violations of U.S. law do not amount to a due process violation*

Coke then argues that the two MOUs are "invalid under the law of the United States" and as such, that this provides yet another basis for exclusion. (Def. Reply Mem. at 6.) Coke asserts that the authority to sign the two MOUs was vested exclusively within the Department of State and that because the MOUs were signed by the DEA, they are illegal. However, there is no limitation imposed by Congress that delegates the authority to enter into such agreements exclusively with the Department of State. In fact 1 U.S.C. § 112b(a) (2004), the Case-Zablocki Act, states: "[a]ny department or agency of the United States Government which enters into any international agreement on behalf of the United States shall transmit to the Department of State the text of such agreement not later than twenty days after such agreement has been signed." See 1 U.S.C. § 112b; 22 C.F.R. 181 (1996). Further, he argues that the fact that these MOUs were initially classified as secret proves that the DEA "actually knew that these two agreements were illegal [and that they] did not want anyone to discover this illegality." (Def. Reply Mem. at 9.) But MOUs for wiretapping orders are always classified as such—if they were public, no one would use their telephones. Ultimately however, even if the wiretaps were obtained illegally, the actions of the Jamaican and DEA agents do not amount to the "shock the conscience" standard necessary for suppression on the basis of a due process violation.

First, federal regulations make clear that agreements entered into by federal agencies, such as the DEA, are in full force and effect even when the Department of State has not been

---

violation would not give rise to right to suppress or other judicially enforceable right in U.S. Court). Similarly, Coke is incorrect when he contends that the wiretap evidence should be excluded because it was obtained in violation of the Mutual Legal Assistance Treaty between the United States and Jamaica ("MLAT"). (Def. 6/14/11 Mem. at 4.) This Circuit has declined to suppress evidence on that basis where the treaty at issue does not explicitly confer individual enforcement rights. United States v. Rommy, 506 F.3d 108, 129 (2d Cir. 2007). Article 1, Section 4 of the MLAT explicitly states that it does not "create any right on the part of any private person to…exclude any evidence." Consequently, Coke's motion to suppress on this ground is also denied.

notified of the existence of the agreements. 22 C.F.R. 181.1(b).[10] Notably, any failure of a federal agency to comply with these regulations does not establish any rights for a criminal defendant seeking to suppress evidence on this ground. Id. Thus, contrary to Coke's assertions, even if these internal government regulations had been violated, they would still not serve as a basis for suppression. Second, even assuming that the MOUs were illegal, the fact that these MOUs were initially classified as secret is no indication that the DEA knew that they were illegal or that it was aware they were taking any action in violation of Jamaican law. Indeed Defendant does not assert any facts from which such a conclusion can be drawn. Owings v. Hull, 34 U.S. 607 (1835), cited by the Defendant, does not support the proposition that any governmental agency is presumed to have full knowledge of another nation's law. It involved the grant of authority by principals to agents to transact business for the principal "according to the laws of the place where it is to be done." Id. at 627-28. Nor has Coke set forth any facts from which this Court can infer, as Coke does, that the DEA believed the MOUs were illegal under either U.S. or Jamaican law.

    c. *The Supervisory Power*

Finally, Coke further argues that this Court should exercise its supervisory powers to suppress the wiretap evidence. (Def. 6/17/2011 Mem at 4-5.) In support of his position, Coke relies on United States v. Payner, 447 U.S. 727, 730 (1980), where a defendant sought to suppress evidence that was obtained resulting from an unlawful seizure from a third party. The District Court recognized that the Defendant lacked standing under the Fourth Amendment to suppress the evidence seized, but nonetheless suppressed the evidence pursuant to the Court's "supervisory power." Id. at 733. The Supreme Court reversed this decision, holding that where

---

[10] "Deviation or derogation from the provisions of this part will not affect the legal validity, under United States law or international law, of agreements concluded, will not give rise to causes of action, and will not affect any public or private rights established by such agreements." 22 C.F.R. 181.1(b).

the search did not violate the Fourth Amendment right of the defendant, "the supervisory power does not authorize a federal court to suppress otherwise admissible evidence." Id. at 735-36. In this instance, it is conceded that the Fourth Amendment does not provide a basis upon which Coke can seek suppression, and as discussed *supra* the Due Process Clause of the Fifth Amendment also does not apply. Consequently, for the Court to use its supervisory powers in this context to exclude evidence is improper under Payner, and, as the Government argues, would effectively undercut well-settled Supreme Court precedent.[11]

Further, in reviewing the same cases relied on in Payner, the Supreme Court has recognized three purposes for the supervisory powers, "to implement a remedy for violation of recognized rights, to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury, and finally, as a remedy designed to deter illegal conduct." United States v. Hastings, 461 U.S. 499, 505 (1983) (internal citation omitted). Again, Coke has no Fourth Amendment right, and the "novel substantive due process right he asks this Court to create cannot be described as a 'recognized right.'" (Gov. Mem. in Opp. at 27.) Nor can it be said that admission of the wire intercepts at trial would jeopardize "judicial integrity." Finally, even assuming a violation of Jamaican law, neither this Court nor the Government is aware of a case in which a United States court has used its supervisory power to deter conduct by United

---

[11] Coke cites to a footnote in Payner which leaves open the possibility that "[f]ederal courts may use their supervisory power in some circumstances to exclude evidence taken from the *defendant* by 'willful disobedience of the law.'" Id. at 734-35 n.7 (emphasis in original). This Circuit, however, has recognized only a limited category of cases in which the supervisory powers have been appropriately used to exclude evidence obtained in a foreign jurisdiction. That use of the supervisory power is appropriate only where the Defendant has a Fourth Amendment right and the conduct of foreign officials in acquiring the evidence is "so extreme that they shock the judicial conscience." See United Sates v. Maturo, 982 F.2d 57, 60 (2d Cir. 1992). The "shocks the conscience" standard applied in the Second Circuit in connection with motions to suppress pursuant to the court's supervisory power appears even higher than that applied in a claim of a due process violation. Where evidence was seized overseas by foreign law enforcement, acting at the request of the United States, courts have held that "[c]ircumstances that will shock the conscience are limited to conduct that 'not only violates U.S. notions of due process, but also violates fundamental international norms of decency." United States v. Vilar, 2007 WL 1075041, at *54 (internal citations omitted). Again, Coke has no Fourth Amendment right, but even assuming that one was available to him, he has alleged no facts that even approach the "shocks the conscience" standard articulated in this Circuit.

State's officials on the ground that such conduct is illegal under foreign law. The Defense has similarly been unable to cite to either persuasive or controlling authority on this issue.

**IV. Conclusion**

For the foregoing reasons, the Defendant's motion is denied in its entirety. Based on Defendant's submissions, an evidentiary hearing is unnecessary.

SO ORDERED.

Dated: New York, New York
August 2̲3̲, 2011

Robert P. Patterson, Jr.
U.S.D.J.