UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - x
                                   :

UNITED STATES OF AMERICA         :
                                   :

       - v. -            :   S17 07 Cr. 971 (RPP)
                                   :

CHRISTOPHER MICHAEL COKE,     :
                                   :

                 Defendant.   :

- - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM

 

                              PREET BHARARA
                              United States Attorney for the
                                Southern District of New York
                              Attorney for the United States
                              of America

Jocelyn E. Strauber
John T. Zach
Assistant United States Attorneys

     - Of Counsel -

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - x
                                        :
**UNITED STATES OF AMERICA**            :
                                        :
          - v. -                        :      **S17 07 Cr. 971 (RPP)**
                                        :
**CHRISTOPHER MICHAEL COKE,**           :
                                        :
                      **Defendant.**    :
                                        :
- - - - - - - - - - - - - - - - - - - - x

### GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this Sentencing Memorandum in connection with the sentencing of defendant Christopher Michael Coke ("Coke"), which is scheduled for February 28, 2012. For the reasons set forth below, the Government respectfully submits that the appropriate sentence is 276 months' imprisonment. That sentence – the statutory maximum in this case – is the sentence recommended by the United States Probation Office.

**I.    Background**

**A.    The Information**

The defendant was originally charged and extradited from Jamaica to the United States on superseding Indictment S15 07 Cr. 971 (RPP), which alleged that the defendant conspired with others to distribute cocaine and marijuana in the United States and to illegally traffick in firearms.

-1-

On August 31, 2011, in connection with defendant's plea agreement, the Government filed superseding Information S17 (the "Information").  (See Presentence Investigation Report ("PSR") ¶¶ 1,5).  Count One of the Information charged that the defendant was the leader of a criminal enterprise known as the "Presidential Click."  The Presidential Click was headquartered in Tivoli Gardens, a garrison community in Kingston, Jamaica. Coke, and the members of Presidential Click, agreed to conduct the affairs of that enterprise through a pattern of racketeering activity, in particular through multiple acts of trafficking in marijuana, cocaine and crack cocaine, in violation of Title 18, United States Code, Section 1962(d).  As alleged in the Information, the Presidential Click, under Coke's control and at his direction, also engaged in firearms trafficking and assault.

Count Two of the Information charged that Coke and the members of the Presidential Click agreed that an assault would be committed against a narcotics trafficker with a dangerous weapon and resulting in serious bodily injury, in connection with that narcotics trafficker's failure to pay a drug debt, and for the purpose of maintaining and increasing position in the Presidential Click enterprise, in violation of Title 18, United States Code, Section 1959(a)(6).  In particular, with Coke's approval and authorization, a narcotics trafficker who owed money to a member of Presidential Click (for marijuana that narcotics

-2-

trafficker had previously received) was stabbed in the face with a knife, causing serious injuries that required hospitalization.

On August 31, 2011, the defendant pled guilty before your Honor to both counts of the Information, pursuant to a plea agreement.  (PSR ¶¶ 5,6).

**B.    The Presidential Click Criminal Organization**

As set forth in the Information, since at least the early 1990s, until his arrest in June 2010, Coke led a criminal organization based in Jamaica known as the "Presidential Click" and also as the "Shower Posse" (the "Organization"). (PSR ¶ 22). The Organization was headquartered in Tivoli Gardens, a neighborhood guarded and policed by armed men controlled by Coke, where many of its members resided.  Organization members also lived in other parts of Jamaica and in the United States.  From his base in Kingston, Coke recruited and directed members of the Organization, and directed and personally participated in the Organization's criminal activities.  (PSR ¶ 22).

As the leader of the Organization, Coke maintained tight control over its members and over the Tivoli Gardens area and its residents.  The Organization had a code of conduct known as the "System."  According to the "System", young men in the Tivoli Gardens community known as "soldiers" were issued firearms by the Organization. (PSR ¶ 25).  These firearms were sent to Coke by Organization members in the United States, who illegally obtained

the firearms and exported them to Jamaica, for Coke's benefit and pursuant to his instructions.  (PSR ¶¶ 23, 31).  The "soldiers" who received firearms were to use them only in accordance with the direction of Coke and his lieutenants.  Soldiers were responsible for maintaining control over their weapons.   Loss or misuse of a firearm was an extremely serious offense, resulting in severe penalties including death.  (PSR ¶ 25).

The soldiers' responsibilities included guarding narcotics stored in stash houses within or nearby Tivoli Gardens, defending the area against rival organizations, locating, apprehending and in some cases punishing individuals at Coke's direction, and participating in election-related activities – including "motivating" members of surrounding communities to support particular candidates for Jamaican political office by intimidation.  (PSR ¶ 25).

Because Coke's soldiers were well-armed and regularly patrolled the streets, and because of Coke's stature and power both within Tivoli Gardens and the greater Kingston area, the Tivoli Gardens community was virtually off-limits to the local police, except those corrupt officers who were loyal to Coke. (PSR ¶ 26).  Coke therefore maintained sole responsibility for determining the culpability of those alleged to have violated the community's or the Organization's rules. (PSR ¶ 26).

As a result, residents of Tivoli Gardens were subject to Coke's violent brand of extra-judicial "justice" with respect to claims of wrongdoing within the community.  Based on information obtained from cooperating witnesses, (themselves members or associates of the Organization who engaged in criminal activities including multiple acts of violence, and narcotics and firearms trafficking), Coke directed the imposition of punishment – typically the infliction of serious bodily injury – on the party he determined to be in the wrong. (PSR ¶ 26).  For this purpose, Coke maintained an area in Tivoli Gardens known as the "jail," where residents could be held and physical punishments carried out.  (PSR ¶ 28).  Punishments were carried out by Coke, with the assistance of his "soldiers" or by the soldiers, at Coke's direction and on occasion, in his presence.  For example, individuals determined to have engaged in domestic violence were subject to severe beatings; individuals "found guilty" for acts of theft could be shot in the hand or foot.  (PSR ¶ 26).

Coke also enforced rules governing his Organization's criminal acts, designed to ensure that Coke maintained complete control over the Organization's crimes and acts of violence.  No one was permitted possess or use a firearm, to sell cocaine, or to commit robberies within Tivoli Gardens or the surrounding communities without Coke's authorization.  (PSR ¶ 26).  Based on information obtained by the Government from cooperating witnesses

Coke murdered three individuals for violations of the Organization's rules – including rules relating to cocaine trafficking.  The penalties for theft of drug proceeds were especially serious.  For example, on one occasion, a trafficker who allegedly stole drug proceeds from Coke was brought to the "jail," tied down, and killed, by Coke, with a chainsaw.  (PSR ¶ 28).

Coke and his soldiers' brutal system of community "discipline" has been the subject of multiple unsolicited letters to this Court from, among others, residents of Tivoli Gardens. They have written that their relatives or acquaintances were abused or killed by Coke or those acting at his direction.  These individuals have on their own initiative come forward, at considerable risk to their own safety, to tell this Court about their suffering and that of their relatives, at the hands of Coke and the Organization.  Indeed, one woman writes that "I might be targeted for death by the Shower Posse if this letter is brought to public record but this letter is my contribution to Jamaica and Jamaicans for their future."  (See Letter to Judge Patterson dated September 26, 2011).

These letters, discussed in more detail herein, are generally consistent with information obtained by the Government concerning Coke's crimes and the brutal way in which he controlled the Tivoli Gardens community.  According to one of the

letters, Coke ordered the gang rape and shooting of a woman who refused to smuggle cocaine to the United States (and who died as a result), (see Letter to Judge Patterson (undated), received September 22, 2011), directed the murder of a sixteen-year old boy, which was carried out by the Organization's soldiers (see Letter to Judge Patterson, dated September 2, 2011), and subjected multiple women in the Tivoli Gardens community to rape and domestic slavery, as well as other abuses (see Letter to Judge Patterson, dated January 16, 2012).

Coke's control over the Tivoli Gardens area, and his reputation for violence, were crucial to his control over the members of his Organization who engaged in narcotics and firearms trafficking in the United States.  These U.S.-based Organization members were large-scale drug traffickers, who regularly carried weapons and were involved in acts of violence. (PSR ¶ 27).  Yet they gave away a portion of their narcotics proceeds to Coke, provided him with firearms at their own expense, and sought his authorization prior to engaging in acts of violence against other members of the Organization.  They did so – despite the fact that they were many miles from Jamaica – because Coke was a violent, intimidating figure whose name they could invoke to enhance their own reputations in the narcotics-trafficking arena, and because they understood that Coke and his followers could harm them (even

in the United States) and their family members (many of whom remained in Jamaica). (PSR ¶ 30).

Tivoli Gardens is one of Kingston's most impoverished areas, and Coke's financial support of the local community provided him with an additional measure of control over its members.  This support – which included hosting community events, providing necessities for children and supporting homes for the elderly and educational clubs and activities for young people –  is reflected in letters sent on Coke's behalf from his associates in Jamaica, a petition dated September 23, 2011, signed by numerous residents of Western Kingston and the surrounding communities, Coke's letter to your Honor, dated September 7, 2011, seeking leniency from this Court, and in Coke's statements to the Probation Department.  (PSR ¶¶ 24, 88, 89).

As discussed further below, Coke's ability to provide financial support to members and institutions in the community is inextricably linked to his narcotics trafficking activity. Whatever sources of legitimate income Coke had, (PSR ¶¶ 97-98), there can be no dispute that narcotics trafficking activities also served as a source of funds for him, and thus for his charitable activities.

C.    **The Charged Conduct**

1.    **Narcotics Trafficking Activities & Acts of Violence**

Coke directed members of his Organization to sell marijuana and cocaine in the United States, and to return the proceeds of those sales to Coke and his co-conspirators in Jamaica.  Coke did so in at least two different ways.

First, Coke agreed with marijuana traffickers in the New York area that those traffickers would sell quantities of marijuana to other members of Coke's organization, who were also in the New York area, at a wholesale price (lower than the price paid by other customers).  The marijuana obtained thereby would be sold at a profit, and the profit would be sent to Coke in Jamaica.  (PSR ¶¶ 23, 32).

A series of telephone calls intercepted by Jamaican authorities, between Coke and co-conspirators based in the New York area and Jamaica, reflect this arrangement.  A co-conspirator agreed to sell marijuana to another associate of Coke's at the co-conspirator's cost; the associate who received the marijuana would sell it at a profit and send that profit to Coke and to another co-conspirator of Coke's in Jamaica. Subsequent recorded calls reflect that Coke obtained and used that money – including to pay for repairs to his Range Rover vehicle in Jamaica.  (PSR ¶ 32).  More generally, Organization members based in the United States who trafficked in narcotics

-9-

would frequently send Coke "tribute" payments – in the form of goods, money and firearms (as discussed further below), in recognition of Coke's support for their narcotics businesses and of Coke's leadership role in the Organization. (PSR ¶ 23, 31, 32).

Second, Coke, along with other co-conspirators, used the women in his community as couriers for cocaine that Coke obtained in Jamaica and sent to the United States.  (PSR ¶ 33).  In the presence of Coke and other co-conspirators, these women were given a quantity of cocaine wrapped in a condom and instructed to insert the cocaine into their bodies (vaginally).  Coke and his co-conspirators provided the women with airplane tickets and instructed them to travel to the United States, generally to New York City or Miami, Florida.[1]  Once they arrived in the United States, the women met with other members of Coke's organization and provided them with the cocaine.  The cocaine was cooked into crack and sold in Miami and the New York area, among other places.  The proceeds of the cocaine sales were then returned to Coke in Jamaica.  (PSR ¶ 33).

Cooperating witnesses have informed the Government that Coke used young women for this purpose, and that many of these women

_____

[1]Coke also used men to transport cocaine.  The men typically swallowed the cocaine prior to traveling to the United States, where the cocaine would be "passed," and then distributed by members of Coke's organization in the United States.

were forced, or essentially forced, to carry the cocaine.  For
example, in or around the late 1990s, one particular courier, who
appeared to be in her early teens, explained that her brother had
"lost" money that belonged to Coke in the United States, and that
and a result, she was forced to transport cocaine to the United
States.  (PSR ¶ 33).

The Organization members who trafficked in narcotics in the
United States were well-armed, large-scale dealers, who regularly
engaged in acts of violence and intimidation to protect their
narcotics businesses.  (PSR ¶ 27).  Yet they shared the profits
from their criminal activities with Coke, sent "tribute" payments
to him (including in the form of firearms) and sought Coke's
authorization and approval before using violence against other
members of the organization. (PSR ¶ 29, 30).  Coke was able to
control these U.S.-based organization members both because he
assisted them and because they feared him.  Coke facilitated
their introduction to narcotics suppliers (generally other
Organization members operating in the United States) and by
touting their relationship with Coke, these U.S.-based
traffickers were better able to intimidate rivals and customers
alike.  (PSR ¶ 30).  By the same token, these U.S.-based
traffickers were well aware that due to Coke's power, willingness
to use violence, and widespread network, he could easily cause

harm to them (in the United States) or their families (in Jamaica) were they to disregard his demands.

Coke's control over his New York-based criminal associates is exemplified by an incident that occurred in May of 2007. At that time, after extensive discussions with Coke and other co-conspirators, and with Coke's approval and authorization, a co-conspirator and member of Coke's organization who was a large-scale narcotics trafficker in the New York area stabbed another member of Coke's organization, who owed that large-scale trafficker a marijuana debt. Prior to that incident, the dispute was discussed with Coke (in Jamaica). Coke, in substance, authorized the large-scale trafficker to take whatever steps were necessary to protect his business, including acts of violence. As Coke acknowledged, and in light of the circumstances in which these discussions occurred, Coke was well aware that an assault would be committed against that individual using a dangerous weapon and that would cause serious bodily injury. Shortly after the discussions with Coke, the large-scale trafficker stabbed the individual who owed him a drug debt in the face with a knife, causing serious bodily injury. (PSR ¶ 29).

**2.  Firearms Trafficking**

Coke also directed Organization members to obtain firearms in the United States and to ship them to Jamaica, where the firearms were received by other members of the Organization and

distributed at Coke's direction.  These firearms were crucial to Coke's ability to maintain his power within, and control over, the Tivoli Gardens area – as set forth in detail above, by arming a crew of loyal soldiers Coke was able to impose a brutal form of discipline and order within the community.  Coke's power and reputation in Jamaica enabled him to extend his authority to the U.S.-based traffickers who had relocated from Tivoli and the surrounding communities to the United States.  Those U.S.-based traffickers, in turn, acquired firearms in the United States for Coke and arranged for the firearms to be transported to Jamaica (in addition to tribute payments, electronics and other goods that Coke requested).  (PSR ¶¶ 31, 32).

The firearms that were sent to Coke in Jamaica were first illegally obtained in the United States by members of the Organization.  Then the firearms were gathered together and subsequently packed for shipment to Jamaica.  Upon their arrival in Kingston, Organization members received the weapons and distributed them at Coke's direction.  (PSR ¶ 31).  Evidence obtained by the Government in the course of the investigation, including intercepted telephone calls, revealed that Coke directly participated in the firearms-trafficking activities of his co-conspirators.  Coke discussed with them the number and types of firearms they were sending, the methods of packaging

them and the specific dates on which they would leave the United States.  (PSR ¶ 32).

## II.  The Applicable Guidelines Sentence is 262 to 276 Months' Imprisonment

The defendant pled guilty to Counts One and Two of the Information before your Honor on August 31, 2011, pursuant to a plea agreement.  (PSR ¶¶ 5-6).  In that agreement, the parties stipulated that Section 2D1.1 of the Guidelines, applicable to narcotics offenses, is used to determine the applicable Guidelines range (because the racketeering activity at issue is narcotics trafficking).  (PSR ¶ 6(b)).  Applying Section 2D1.1(c)(3), the base offense level is 34, because Coke is responsible for the distribution of between 3,000 and 10,000 kilograms of marijuana and between 15 and 50 kilograms of cocaine.  (Id.)  Because Coke received firearms from his co-conspirators in connection with the narcotics trafficking conspiracy, two offense levels are added, pursuant to Section 2D1.1(b)(1); because Coke was an organizer and leader of this conspiracy, which involved five or more participants, four levels are added pursuant to Section 3B1.1(a). (PSR ¶¶ 6© & (d)). Finally, because Coke recklessly created a substantial risk of death and bodily injury to others while fleeing from law enforcement officials, two additional levels are added pursuant to Section 3C1.2, resulting in a total offense level of 42.  (PSR ¶¶ 6(e), (f)).

-14-

With respect to Count Two, the parties agreed that the base offense level for the assault is 14, pursuant to Section 2A2.2, increased by four levels because the assault involved a dangerous weapon, pursuant to Section 2A2.2(b)(2)(B).  (PSR ¶¶ 6(h) & (I)).  Because the victim sustained serious bodily injury, the offense level is increased by five, pursuant to Section 2A2.2(b)(3)(B).  (PSR ¶ 6(j)).  Four levels are added for Coke's leadership of this conspiracy and two levels are added due to Coke's reckless creation of a substantial risk of death and serious bodily injury while fleeing, resulting in a total offense level of 29 for this offense.  (PSR ¶¶ 6(k) & (l)).

Pursuant to Section 3D1.3(a), the offense level is 42, the highest offense level of the aforementioned counts.  (PSR ¶ 6(n)).  The offense level is reduced by 3 because Coke has accepted responsibility for his actions by pleading guilty, pursuant to Section 3E.1.(a) and (b), resulting in an offense level of 39.  (PSR ¶¶ 6(o) & (p)).  With a criminal history category of I, the resulting Sentencing Guidelines range is 262 to 327 months.  (PSR ¶ 6(p)).  However, because the combined statutory maximum sentence in this case for the two counts of conviction is 23 years – a total of 276 months – the applicable Sentencing Guidelines range becomes 262 to 276 months.  (PSR ¶ 6(p)).

The Probation Department recommends a sentence of 276 months' imprisonment – the statutory maximum in this case.  <u>See</u> PSR at 26-28.

## III. The Probation Department's Recommended Sentence Of 276 Months' Imprisonment Is The Appropriate Sentence

### A. Applicable Law

Although the Guidelines are no longer mandatory, they nevertheless continue to play a critical role in accomplishing the "basic aim" that Congress sought to achieve in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." <u>United States</u> v. <u>Booker</u>, 543 U.S. 220, 252 (2005).  In furtherance of that goal, sentencing Courts are required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' § 3553(a)(4), the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims, §§ 3553(a)(1), (3), (5)-(7) (main ed. and Supp. 2004)." <u>Id</u>. at 259-60.

The Second Circuit has recognized that while "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime[,]" based on the judge's independent analysis of the factors set forth in 18 U.S.C. § 3553(a), the Sentencing Guidelines "provide

-16-

'the starting point and the initial benchmark' for sentencing, and district courts must 'remain cognizant of them throughout the sentencing process.'"  United States _v._ Cavera, 550 F.3d 180, 188-89 (2d Cir. 2008) (en banc).   The Circuit has explained that the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'"  United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (quoting United States v. Jimenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)).

     Similarly, in Rita v. United States, 551 U.S. 338 (2007), the Supreme Court reaffirmed the central role played by the Guidelines at sentencing, because the Guidelines, by statute, "seek to embody the § 3553(a) considerations, both in principle and in practice."  551 U.S. at 350.  Accordingly, although a sentencing Court "may not presume that a Guidelines sentence is reasonable,"  "sentencing judges are not free to ignore the Guidelines, or to treat them merely as a 'body of casual advice.'"  Cavera, 550 F.3d at 189 (quoting United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005)).  When a sentencing Court does sentence outside the Guidelines range, it "'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of

-17-

a variance.'"   Cavera, 550 F.3d at 189 (quoting Gall v. United States, 128 S.Ct. 586, 597 (2007)).

As the Court is aware, Title 18, United States Code, Section 3553(a) requires that the Court impose a sentence "sufficient, but not greater than necessary" to comply with the factors set forth in Section 3553(a)(2).  These factors include, in addition to the Guidelines and applicable policy statements, and the applicable Sentencing Guidelines range, the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, the kinds of sentences available and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  See 18 U.S.C. § 3553(a).

**B.   The Appropriate Sentence In This Case Is 276 Months' Imprisonment**

The Government respectfully submits that a sentence of 276 months' imprisonment – the statutory maximum sentence and only fourteen months above the bottom of the applicable Guidelines range – is the appropriate sentence, and one that is sufficient but not greater than necessary to comply with the goals of Section 3553(a).  The Government's contention is consistent with

-18-

the judgment of the Probation Department, which recommends that
Coke receive the maximum sentence permitted under the applicable
statutes.  (See PSR at 25).

## 1.   The Nature and Circumstances of the Offense

The nature and circumstances of the offense are extremely
serious and counsel in favor of a sentence of 276 months'
imprisonment – the statutory maximum.  Coke ran and controlled an
international criminal organization, and the local Kingston
community of Tivoli Gardens, through a combination of violence,
intimidation and financial power.  Coke's control was buttressed
by the narcotics proceeds and firearms that Coke obtained from
his U.S.-based criminal associates.  Those U.S.-based associates,
in turn, supported Coke because a close relationship with Coke
increased their status in their communities and enabled them to
intimidate their drug customers and rivals, but also because some
of their family members remained in Tivoli Gardens or the
surrounding communities and were vulnerable to retaliation by
Coke and members of his Organization.

There can be no dispute that Coke's crimes – his leadership
of a criminal organization engaged in narcotics-trafficking,
firearms-trafficking and assault - were particularly serious.
Coke and his associates trafficked in large quantities of
dangerous narcotics –  3,000 to 10,000 kilograms of marijuana and
15 to 50 kilograms of cocaine that were distributed in the United

States.  Coke's co-conspirators were frequently armed with
firearms and other weapons in furtherance of their narcotics
trafficking activities.  As Coke acknowledged at his guilty plea,
on at least one occasion an Organization member who failed to pay
a marijuana debt to another member of the Organization was
stabbed in the face with a knife, causing serious injury, with
Coke's approval and authorization.  Coke's role in these
activities went unpunished for over a decade – in large part
because his influence over his followers permitted him to control
his narcotics-trafficking associates in the United States,
including their of acts of violence (which he authorized), and to
reap the profits of their criminal activities, without ever
leaving his protected base in Kingston, Jamaica.

   Coke's virtual immunity from the reach of law enforcement in
Kingston was due to an equally dangerous aspect of his crimes –
his ability to obtain large quantities of firearms from his U.S.-
based narcotics trafficking associates.  The firearms-trafficking
activities in which Coke participated, and which involved the
movement of large quantities of illegal weapons in interstate and
foreign commerce, are equally serious crimes.  Intercepted calls
reveal Coke's close control over these shipments of weapons and
indicate that Coke obtained large quantities of high-caliber
firearms in this manner.  For example, a recorded call in which
Coke and a co-conspirator discussed a single shipment of weapons

makes clear that this shipment alone involved eight or nine firearms.  (See Transcript of May 8, 2007 9:28 p.m. Call).  As multiple witnesses have informed the Government, numerous shipments of firearms were sent to Coke from his co-conspirators in the United States during the decade-plus time-frame of the charged conspiracy.

Perhaps even more disturbing, Coke exploited some of the more vulnerable members of his community to commit these crimes. Many of Coke's co-conspirators were themselves large-scale narcotics traffickers who regularly carried weapons and engaged in acts of violence to protect their narcotics businesses.  Some, however, were young women whom Coke pressured or forced to transport cocaine to the United States from Jamaica.  For example, a cooperating witness has informed the Government of a very young female who appeared terrified to transport cocaine to the United States, but explained that because her brother had lost money belonging to Coke in the United States, she was required to do so.  Furthermore, in light of Coke's position within the community, and his well-established reputation for violence, it is clear that the female couriers used by Coke were not, as a general matter, free to refuse Coke's demands that they transport cocaine to the United States.

That view is consistent with a letter received by your Honor from a woman who alleged that her daughter "was gang rape[d] and

shot in her vagina by Christopher Coke and his Shower Posse co-conspirators . . . for refusing to carry cocaine to America." (See Letter to Judge Patterson (undated), received September 22, 2011).  The Government has no independent information about this particular incident, but such graphic and disturbing details appear unlikely to be fabricated, nor is the Government aware of any possible motive the author might have to do so.

Furthermore, the brutal, horrific violence that the author describes is consistent with another writer's description of her sister, who was abused and kidnaped by Coke, and the fate of many women in Tivoli Gardens, "whom Coke uses and abuses as violently as he likes.  Women who oppose his control find themselves locked up in his informal jail, in West Kingston, where being fed to crocodiles is only one of the many penalties women have to endure.  Rape and domestic slavery are some of the others. Christopher Coke is known to use an electric chain saw and a hot iron as implements of torture on women."  (Letter to Judge Patterson, dated January 16, 2012).

More generally, Coke's control over the Tivoli Gardens community – a control facilitated by Coke's use of violence and access to firearms – damaged the lives of its residents and the residents of the surrounding communities.  Coke's soldiers often began their service to him as teenagers, drawn from the community and trained by Coke and his lieutenants to guard the streets of

Tivoli Gardens with guns and to engage in acts of violence at Coke's direction.  As one woman who was born in Jamaica wrote: "Coke has dedicated his life to killing and exploiting poor black youngsters from Jones Town, Tivoli, Rema and Denham Town." (See Letter to Judge Patterson, dated September 26, 2011).  Another woman wrote of the killing of her sixteen-year old son by "Shower Posse gunmen," for which she held Coke "personally responsible" and stated that Coke is similarly responsible "for the deaths of hundreds of Jamaicans." (See Letter to Judge Patterson dated September 2, 2011).

These letters makes clear, as the Probation Department recognized, that "Coke is being held responsible for a fraction of the harm that he knowingly caused to numerous individuals and their families both in the United States and Jamaica." (See PSR at 28).  For that reason, and in light of the very serious crimes that Coke has pled guilty to here, the statutory maximum sentence is the appropriate one.

### 2.    The History and Characteristics of the Defendant

The Government respectfully submits that the defendant's history and characteristics similarly call for the statutory maximum sentence.

While there is no dispute that Coke provided extensive and significant support to the Tivoli Gardens community,[1] such support is plainly eclipsed by the magnitude of Coke's crimes and, most significantly in this context, the harm those crimes inflicted on the members of the very community he claims to have supported.  For that reason, among others, Coke's contributions to the community do not justify a sentence below the statutory maximum.

First, it cannot be seriously disputed that the narcotics trafficking in which Coke engaged was lucrative and that Coke received tribute, including in the form of cash and goods, from

---

[1]Among other things, letters and affidavits submitted by members of the Tivoli Gardens community assert that Coke has been "generous" and "extremely kind to children and senior citizens," (see Affidavit of Patricia Nelson Hall), that Coke "fed and partially maintained" a home for the elderly in Kingston, especially on holidays, that Coke helped the Parent/Teachers Association raise funds, including through holding a "Back to School night" where Coke would provide the children with uniforms, books and school fees, as well as another fund-raising event (see Affidavit of Patricia Pious), that at Easter Coke held a charitable event for the elderly and sponsored other "entertainment packages" involving sporting events and talent shows, and founded a Parent Association committee, designed to keep young children at home during late hours, especially on school days, (see September 23, 2011 Petition signed by numerous members of the Western Kingston and surrounding communities), and that Coke sponsored a community youth club, named "the Presidential Click Police Youth Club" (see Letter of Omar Richards (nephew to Christopher Coke), dated November 14, 2011). Coke's own letter, dated September 7, 2011, also describes his extensive charitable works, supported by certain documents provided to the defendant in discovery. (See Letter of Christopher Coke to Judge Robert P. Patterson, dated September 7, 2011).

the U.S.-based narcotics traffickers who were members of his
Organization.  The criminal acts to which Coke pled guilty thus
directly contributed to his ability to support the Tivoli Gardens
community financially.  Coke should not be given leniency, and
thus rewarded for, charitable works made possible in part by the
illegal activities for which he is being sentenced here.

Second, Coke's contributions to the community were a means
to control its members, who otherwise might have resisted Coke's
leadership and control.  The letters that your Honor has received
from residents of Tivoli Gardens and the surrounding communities
reflect the suffering of individuals and their families at the
hands of Coke and other members of his Organization.  In light of
Coke's brutal code of discipline, his control of the Tivoli
Gardens community through violence and intimidation, and his
exploitation of the weaker members of the community, the
financial assistance Coke provided to residents of Tivoli Gardens
was crucial to Coke's ability to retain their loyalty.

Indeed, Coke's criminal conduct is more disturbing when
considered against the backdrop of his charitable efforts to
assist his community.  Those efforts make clear that the
defendant was in a position to understand the needs of his
community and the resources available to alleviate the problems
of poverty and lack of opportunity in Tivoli Gardens.  The fact
that Coke used that same community as a hub of his own criminal

activity and exploited its young and vulnerable members by
encouraging or forcing them to participate in his criminal acts
makes his conduct that much more depraved.  Coke's conduct in
this respect – indicative of a core disregard for the needs of
his community – is consistent with his initial refusal to
surrender to law enforcement authorities in Kingston, a decision
which led to a military incursion into Tivoli Gardens to
apprehend him and the deaths of over seventy people.

### 3.    Deterrence And Protection of the Public

Coke engaged in the charged crimes for over ten years with
impunity.  He did so while occupying a prominent position as the
leader not only of the Presidential Click criminal organization,
but of the Tivoli Gardens community.  In so doing, Coke flouted
the laws of both Jamaica and the United States.  He participated
in narcotics and firearms-trafficking crimes in the United States
and illegally channeled the cash profits and the weapons to
himself and his criminal associates in Kingston.  Coke caused
serious harm to countless others in so doing and for many years
appeared to live beyond the reach of law enforcement.

For these reasons, among others, Coke's arrest, the
progression of his criminal case, and his guilty plea have been
the focus of significant international attention.  As noted on
September 2, 2011, in an editorial in the Jamaican daily
newspaper, <u>The Gleaner</u>, several days after Coke pled guilty,

murders and other serious crimes plummeted in Jamaica following Coke's arrest.  The editorial expressed hope that "Coke's arrest and guilty plea mark the crossing of a Rubicon – and the end of impunity by such hard men of violence and crime." (See First Attachment to Letter to Judge Patterson, dated September 2, 2011).  In this context, a sentence that is the maximum allowed for the crimes to which Coke pled guilty will have a powerful deterrent effect.  Such a sentence will make clear that those leaders of international organizations who commit crimes in the United States and who use violence and intimidation to achieve their aims, harming citizens of two countries in the process, will be punished to the fullest extent of the law.

A sentence of 276 months is also necessary to protect the public from further crimes of the defendant.  Indeed, those individuals who wrote to your Honor describing the harm done by Coke and his co-conspirators asked that he be kept "away from Jamaica forever" (see Letter to Judge Patterson dated January 16, 2012), that Coke be "put away forever" (see Letter to Judge Patterson dated September 2, 2011), and that Coke "spend the rest of his life in a maximum security facility" (see Letter to Judge Patterson, undated, received September 22, 2011).  It is clear from the circumstances of Coke's arrest that he had an extremely loyal following in Jamaica, including those willing to risk their lives to defend him.  A substantial sentence – the statutory

maximum – is necessary to reduce the risk that Coke resumes his leadership position in the Organization and his criminal activities upon his release from prison and his return to Jamaica.

### Conclusion

For the reasons set forth above, the Government respectfully submits that the appropriate sentence in this case, and one that is sufficient but not greater than necessary to serve the goals of Title 18, United States Code, Section 3553(a), is a term of imprisonment of 276 months.


Dated:     New York, New York
           February 22, 2012



                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York



                         By:_____/s/_____
                              JOCELYN E. STRAUBER
                              JOHN T. ZACH
                              Assistant United States Attorneys
                              Tel: (212) 637-1034/2410

<u>CERTIFICATE OF SERVICE</u>

JOCELYN STRAUBER deposes and says that she is employed in the Office of the United States Attorney for the Southern District of New York, and that, on the 22st day of February, 2012 She caused to be served a copy of the within Government's Sentencing Submission on Stephen Rosen, Esq., and Frank Doddato, Esq., by e-mailing the document to <u>attyrosen@aol.com</u> and fadesq49@aol.com.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.


_____/s/_____
JOCELYN E. STRAUBER

Dated:      February 22, 2012
            New York, New York